UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

ASHLEY M. LAREAU,               )
                                )
      Plaintiff,                )
                                )
            v.                  )        Case No. 2:17-cv-81
                                )
NORTHWESTERN MEDICAL CENTER,    )
                                )
      Defendant.                )

## OPINION AND ORDER

Plaintiff Ashley Lareau claims that Northwestern Medical Center ("NMC") fired her, at least in part, because of a disability. Now before the Court is NMC's motion for summary judgment on all claims. For the reasons set forth below, the motion is **denied.**

## Background

The parties have each submitted statements of material fact with respect to NMC's motion for summary judgment. For purposes of that motion, the material facts will be viewed in a light most favorable to Lareau, as she is the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

In October 2014, Lareau applied for a position at NMC in the Patient Access Department. On November 26, 2014, NMC offered her a position as a Patient Access supervisor contingent upon successful completion of pre-employment testing, including a health screening. Lareau disclosed during the health screening that she had epilepsy and suffered from seizures. The screening

was performed by Doreen Benoit, who determined that Lareau would be able to perform the essential functions of the job.

Lareau started her new job on December 1, 2014. Her initial supervisor was Latayvia Law. After Law left NMC in April 2015, Lareau reported to Chief Financial Officer Ted Sirotta. Lareau made Sirotta aware of her epilepsy, and the two of them discussed related limitations, including Lareau's ability to drive. That same month, Lareau was promoted to interim Patient Access Manager. The promotion was based on merit and included a substantial pay raise.

During Lareau's time as a manager, NMC was going through a large construction project. Consequently, in addition to her usual duties overseeing over sixty employees and tracking cash collections, Lareau was required to attend weekly meetings to discuss the physical design of the new department. Also, when NMC undertook upgrades to its electronic medical records system, Lareau was required to provide regular support for her staff. Lareau wore a pager so that she could be contacted at all times, and submits that she was dedicated to NMC twenty-four hours a day, seven days a week.

In October 2015, Lareau was named the permanent Patient Access Manager and received another substantial raise. While there was some concern expressed about her lack of leadership experience, Lareau received supportive endorsements from, among

others, NMC Chief Executive Officer Jill Bowen.  At the time of her promotion, NMC contemplated providing her with ongoing training and development, including long-term mentorship.

In January 2016, Lareau received an appraisal of her work performance for the year 2015.  The comments in the appraisal complimented Lareau on her performance as the interim manager and her strong start in her new position.  The majority of the appraisal was completed by CFO Sirotta, who wrote a lengthy letter summarizing Lareau's strengths.  Areas for improvements were also identified, although there is a factual dispute about whether those areas pertained to Lareau individually or to the Patient Access Department generally.  Lareau contends that some of the perceived deficiencies were due, at least in part, to inadequate staffing.  The appraisal also expressed management's concern that Lareau would be asked to meet the demands of the new managerial position while attending school to complete her bachelor's degree.  The appraisal rated Lareau's performance as "solid," which warranted a pay raise of 2.5%.

Lisa Bovat became the Director of Hospitality Services in January 2016.  NMC concurrently restructured its departments so that the Director of Hospitality Services oversaw the Patient Access Department.  As a result, Lareau began reporting directly to Bovat, who in turn reported to CIO Joel Benware.  Because the Patient Access Department connects closely with billing services,

Lareau communicated her concerns about the new reporting structure. Naomi Wright, a human resources advisor, has testified that it is traditional for the Patient Access Manager to report to the CFO rather than the CIO. ECF No. 132-15 at 3. Lareau also did not want Bovat as her immediate supervisor because Bovat had no experience with patient access, and thus could not mentor her in her new managerial position.

Lareau believed from the outset that Bovat held animosity toward her. She cites comments by Bovat about Lareau's lack of a bachelor's degree, and that despite not having a four-year degree Lareau had the higher salary of the two. Defendants note that even assuming such animosity, Bovat's criticisms were not related to Lareau's epilepsy or seizures. Lareau asks the Court to view Bovat's animosity in the context of subsequent discriminatory acts, including Bovat's practice of keeping track of Lareau's illness and reporting to Benware when Lareau was upset or crying.

Lareau suffered three seizures on January 14, 2016, and was in the hospital for two days thereafter for evaluation. There is a factual dispute about whether Bovat and Benware were aware of the seizures. Lareau testified in her deposition that she believed her husband called NMC to notify her workplace of her absence, and explained that the absence was due to a seizure. ECF No. 132-3 at 22. Her husband has confirmed making that phone call. ECF No. 132-39 at 1.

After an appointment with a Physician's Assistant in late
January, Lareau informed Benware and Bovat that she would be
filing for intermittent leave under the Family Medical Leave Act
("FMLA") due to recent changes in her health.  ECF No. 132-3 at
25.  Lareau testified that after her discussions with Benware and
Bovat, Bovat followed up with "lots of questions" about how much
time Lareau would be missing, and how much work she was planning
on completing.  *Id.* at 47-48.  When Lareau informed Benware and
Bovat that surgery was possible, they reportedly "asked a lot of
questions about what does that mean, what does that look like for
your work, how much time are you going to be missing."  *Id.* at
48.

In March 2016, Benware suggested that a development plan be
put in place for Lareau.  NMC's Vice President of Human Resources
Tom Conley instead recommended a Performance Improvement Plan
("PIP"), which can be used by the employer to establish a record
prior to an employee's termination.  Conley has described the
implementation of a PIP as "punitive."  ECF No. 132-17 at 9.

There are factual disputes about the reasons for the PIP.
Defendants contend that Bovat had spoken to Lareau earlier in
2016 about performance issues, including not only management
skills but also time management problems and resistence to
mentoring.  Defendants submit that the PIP was put in place after
Lareau failed to demonstrate improvement in those areas.  Lareau

5

notes that criticisms about time management and mentoring are not evidenced in the personnel record. In a related argument, she contends that NMC's procedures for a PIP were not followed as she was not given any prior written notice of alleged failures.

Lareau testified that a PIP is an action pursuant to which an employee tries to make improvements within 90 days. ECF No. 132-3 at 34. It is undisputed that when Lareau first received the PIP and reviewed it, she understood that failure to meet the specified expectations could lead to termination. Lareau met in March 2016 with Bovat, Benware, and HR advisor LaRocque to discuss the PIP. She did not raise any issues at that time about her epilepsy, seizures, or FMLA requests. Nor did Lareau make any request for an accommodation.

On Friday, April 8, 2016, Lareau had a seizure in the NMC cafeteria. The seizure occurred on the last day of Patient Access Week, which was an important time for the Patient Access Department. After her seizure, Lareau recalls waking up in a hospital bed at NMC and being visited by Bovat. Lareau went home that same day after receiving treatment, and returned to work the following Monday.

On April 12, 2016, Lareau submitted an FMLA Certification of Health Care Provider form to Louise Rocheleau, NMC's HR benefits specialist. The form, completed by Advanced Practice Registered Nurse ("APRN") Lindsay Schommer, stated that Lareau had epilepsy;

that her epilepsy did not make her unable to perform any of her job functions; that Lareau would need time off in the future to undergo evaluation as a surgical candidate; that she would need time off for work-ups; that she would need a day off after any seizure; that sleep deprivation and excessive stress could exacerbate her condition; and that reasonable accommodations should be made as necessary.  ECF No. 120-15 at 2.

On or about April 22, 2016, Lareau had a follow-up meeting with Bovat to update the PIP.  During that meeting, Lareau again did not reference her epilepsy, seizures, or any related driving limitations.  Similarly, Bovat never told Lareau that her alleged performance deficiencies were related to epilepsy, seizures, or driving limitations.

Lareau met with Bovat again in June 2016 to discuss the PIP. While Lareau did not ask for any accommodations during that meeting, she contends that the PIP listed scheduling difficulties and project management issues that bore on her disability and her upcoming leave.  After the June 2016 meeting, a third version of the PIP was allegedly drafted, though Lareau disputes whether she ever received the June draft.[1]

---

[1] In her deposition, Lareau stated that she reviewed a draft of the PIP with Bovat in June 2016.  ECF No. 120-27 at 38-39.  In a subsequent affidavit, she stated that she never received the June PIP.  ECF No. 132-32 at 3.  Because the record is not clear about which PIP was reviewed in June 2016, and since a party cannot created a triable issue of fact by submitting an affidavit that is inconsistent with prior deposition testimony, the Court

The June PIP identified performance progress in a variety of areas as "incomplete." Those areas included management of people; communication with team members; time management; project management; initiative; and professionalism. The June PIP also identified several areas in which Lareau allegedly failed to meet performance deadlines. Lareau contends that these allegations of failure are contradicted by an August 16, 2016 email from Bovat to CIO Benware summarizing Lareau's progress on the PIP. The email stated in part that "Ashley continues to develop as a Manager at NMC. She has met our minimum requirements for most items listed above that were in need of immediate improvement." ECF No. 132-16 at 10-11. Bovat titled the email "Closing March 90 Day Performance Improvement Plan," *id.* at 3, which was consistent with Lareau's understanding that the PIP was closed.

On July 7, 2016, Lareau submitted a "Request for Leave of Absence" form to Rocheleau requesting FMLA leave starting on June 28, 2016 and ending on July 7, 2016. ECF No. 120-16. Her April 12, 2016 FMLA Certification form stated that the treatment schedule and recovery period for each appointment would be six to twelve months. While NMC contends that it granted Lareau's FMLA request, Lareau notes that she was terminated from her job within the six to twelve month recovery period.

---

will not assume at summary judgment that Lareau never saw the June PIP.

On July 11, 2016, APRN Schommer submitted a Fitness for Duty Report pertaining to Lareau. The Report stated that Lareau should resume work part-time as tolerated; that she might require additional time to make up for missed work or participate in career development programs; that she would have a lower threshold for avoiding seizures if she was sleep deprived or under stress; and that patients with epilepsy, as protected by the Americans with Disabilities Act ("ADA") and the FMLA, have the right to "reasonable accommodations free from undue discrimination or repercussions." ECF No. 120-17 at 2. APRN Schommer reported that Lareau could perform the essential functions of her job, but again noted that she should increase her hours only as tolerated. *Id.* at 1. APRN Schommer further opined that Lareau should be able to return to work full-time in the near future, and that the seizures were extremely rare. *Id.* at 2.

Rocheleau testified that she did not share the July 2016 Fitness for Duty Report with either Bovat or Benware, and instead kept it in a confidential benefits lock box. Lareau's FMLA form and request for leave of absence were also allegedly kept confidential. Lareau contends that although NMC procedures required that personnel files and benefits files be maintained separately, NMC nonetheless produced those documents in response to a discovery request for her personnel file. Rocheleau

testified that if the benefits files, complete with personal health information, were included in Lareau's personnel file, that inclusion would have been a mistake.  ECF No. 120-31 at 10.

Lareau also notes that Rocheleau never discussed ADA accommodation requests with her, and did not engage in any interactive process concerning the ADA-related information on the Fitness for Duty Report.  After Lareau's termination, NMC developed an ADA accommodation request form.  *Id.* at 14.

On July 15, 2016, the Patient Access Department had a reorganization meeting.  Lareau believed the meeting was held to "figure out ways to improve projects and make sure that adequate resources were designated to each group."  ECF No. 132-3 at 38. As a result of the reorganization, Benware assigned responsibility for some of Lareau's work to Amanda Hill.

There is a factual dispute about whether the restructuring resulted in a reduction of Lareau's responsibilities.  Lareau characterizes the restructuring as a shift in responsibilities. Among other things, she was asked to visit satellite locations, which required additional driving or other form of transportation.  At the time, Lareau was unable to drive.

On July 29, 2016, Lareau spoke with Conley and discussed her driving limitations and other issues related to her disability. Lareau informed Conley that she felt like she was being targeted by Benware and Bovat, that her doctor had submitted a list of

accommodations, and that the listed accommodations were not being respected. ECF No. 132-2 at 42. She also believed that changes in her workload were setting her up to fail. *Id.* Although Conley reportedly suggested that Lareau make an ADA accommodation request and submit the request to a committee, she declined to do so. Lareau explained in her deposition that if Benware or Bovat were on the committee, such a request "would be another reason for them to terminate me. Because I already felt targeted." *Id.* at 45.

NMC contends that even with the post-restructuring reduced workload, Lareau failed to correct the deficiencies identified in her June PIP. Lareau notes that during the time between the restructuring meeting on July 15, 2016 and her termination on August 29, 2016, she was only at work for less than one month due to a ten-day vacation and a short bereavement leave.

In late August 2016, Human Resources informed Benware that Lareau had failed to properly staff the Patient Access Department and failed to properly forecast staffing needs. NMC claims that Lareau also failed to make sufficient progress on the "Score Card" project. "Score Card" was a tool Lareau had obtained to track NMC's revenue cycle. Lareau attributes her difficulty with "Score Card" to failures by outside vendors to provide her with the necessary data.

In an email dated August 26, 2016, in response to a question

from Benware, outside consultant Dan Hobb stated that Lareau's "Score Card" should be a lot more complete and that she had received significant help. Lareau concedes the content of Hobb's email, but notes that "Score Card" was not an essential element of her job, that there were no prior warnings, and reiterates that she was unable to obtain the required information without reports from third parties.

On August 26, 2016, Benware gave Conley a memo regarding Lareau's job performance. The memo recommended that Lareau's employment be terminated based upon multiple documented cases of poor job performance. Specifically, Benware explained that outside consultants and internal project leaders asked that Lareau be removed from the Meditech electronic medical record platform team because she had been unable to focus and had created disruptions in training sessions. Benware further noted that Lareau had not demonstrated consistent management level skills to complete tasks independently, and had been unable to manage projects without excessive support from both colleagues and management.

Lareau does not dispute the content of the August 26, 2016 memo, but takes issue with its conclusions. Benware referred in his deposition to childish and unprofessional behavior being factors in Lareau's termination, while Lareau submits that such behavior was never documented. Lareau also cites the August 2016

email from Bovat indicating satisfactory improvement.

NMC provided health care insurance for Lareau while she was employed there.  Insurance was provided through a self-insured, employer-sponsored health plan that NMC administered.  Because NMC administered the plan, it paid claims for medical treatment through a third party administrator, CBA Blue.

As the Vice President of Human Resources at NMC, Conley had direct communications with CBA Blue.  Conley and Rocheleau also communicated with NMC's insurance broker, The Richards Group ("TRG").  Conley did not recall having any specific communications about Lareau with representatives at CBA Blue.  He did, however, receive emails from Karen Hurwitt of CBA Blue that referenced Lareau.  Those emails were sent in response to his request for information on large claims, as NMC was over budget.

Emails sent from CBA Blue and TRG to Rocheleau and Conley occasionally included Claims Reports as attachments.  Those Claims Reports contained medical services information and other health information pertaining to employees and their dependents. Conley and Rocheleau were the only NMC employees who received Claims Reports via email, which was encrypted.  They were also the only employees at NMC who had access to the Claims Reports, which required two different sets of passwords to open.

It is disputed whether Benware and Bovat had access to Lareau's personnel file located in the Human Resources

Department.  Lareau also disputes the assertion that the decision
to terminate her was made solely by Benware.  Lareau contends
that her termination was the product of a several-month process
that was set in motion by Conley after her January 2016 seizures.
While NMC alleges that the termination was based purely on job
performance, Lareau counters that certain facts, such as the lack
of an interactive process, a failure to accommodate her illness,
and her inconsistent performance reviews, indicate otherwise.

On August 31, 2016, Lareau filed a charge of employment
discrimination with the Equal Employment Opportunity Commission
("EEOC").  She received a Right to Sue letter on February 16,
2017, and initiated the instant case by filing a Complaint on May
9, 2017.  Her First Amended Complaint alleges violation of the
FMLA; violation of the ADA; violation of the Vermont Fair
Employment Practices Act; and wrongful termination and breach of
medical confidentiality under 42 U.S.C. § 12112.  For relief,
Lareau seeks compensatory damages, punitive damages, liquidated
damages, and attorney's fees.

**Discussion**

I.   **Summary Judgment Standard**

NMC has moved for summary judgment on all claims.  Summary
judgment is granted when "the movant shows that there is no
genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

"In determining whether summary judgment is appropriate, [the] Court will construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks and citations omitted). The Court reviews the movant's support for its claim that the record "could not lead a rational trier of fact to find for the non-moving party." *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir. 2001). If the moving party fulfills its preliminary burden, the burden shifts to the non-movant to come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## II. Prima Facie Claim of Disability Discrimination

The ADA prohibits an employer from discriminating against a qualified employee on the basis of a disability. 42 U.S.C. § 12112(a). Discrimination claims under the ADA are analyzed under the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *See Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). This framework requires the plaintiff to "first establish a *prima facie* case of discrimination under the ADA, after which the burden of proof shifts to the defendant to 'articulate some legitimate, nondiscriminatory reason for'" its actions. *Fox v.*

*Costco Wholesale Corp.*, 918 F.3d 65, 71 (2d Cir. 2019) (quoting *McDonnell Douglas*, 411 U.S. at 802).  If the defendant meets its burden, the plaintiff must then "demonstrate that [the defendant's] assigned reason . . . was a pretext or discriminatory in its application."  *McDonnell Douglas*, 411 U.S. at 807.

## A.  Discrimination

### 1.  Disability

To establish a *prima facie* claim of disability discrimination under the ADA, a plaintiff must demonstrate that (1) the employer is subject to the ADA, (2) the plaintiff was disabled within the meaning of the ADA, (3) the plaintiff was otherwise qualified to perform the essential functions of the job, with or without a reasonable accommodation, and (4) the plaintiff suffered an adverse employment action on the basis of disability.  *Sista*, 445 F.3d at 169.  NMC first argues that Lareau cannot establish a *prima facie* claim of disability discrimination under the ADA or the Vermont Fair Employment Practices Act ("VFEPA") because she does not suffer from a qualifying disability.[2]

The ADA defines a disability as: (1) a physical or mental

_____

[2] The standards of proof under the VFEPA are identical to those under the ADA.  *See Cobb v. Dufresne-Henry, Inc.*, 603 F. Supp. 1048, 1053 (D. Vt. 1985).

impairment that substantially limits one or more major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(1). The definition of disability is "construed in favor of broad coverage." *Id.* § 12102(4)(A). "An impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(ii). "[T]he determination of the existence of a substantial limitation on a major life activity must be determined on a case-by-case basis." *Capobianco v. City of New York*, 422 F.3d 47, 56 (2d Cir. 2005).

NMC does not dispute that epilepsy is a disability under the ADA. *See Lovejoy-Wilson*, 263 F.3d at 216 (noting that "epilepsy constitutes a disability under the ADA"). NMC does challenge Lareau's assertion that her epilepsy substantially limits a major life activity. "'[S]ubstantially limits' is not meant to be a demanding standard," since "[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity." 29 C.F.R. § 1630.2(j)(1)(i), (iii). Therefore, "the threshold issue of whether an impairment 'substantially limits' a major life

activity should not demand extensive analysis." *Id.* §
1630.2(j)(1)(iii).

Major life activities under the ADA regulations include
walking, standing, concentrating, thinking, and communicating, as
well as the functioning of neurological and musculoskeletal
systems. 29 C.F.R. § 1630.2(c)(1)(i)(ii). Federal regulations
state that epilepsy should "easily" be considered as a
substantially limiting major life activities because it
"substantially limits neurological function." *Id.* §
1630.2(j)(3)(iii). Moreover, the evidence in this case
establishes that at the time of her seizures, Lareau experienced
loss of consciousness, delayed memory recovery, delayed mobility,
lack of coordination, and anxiety. While her seizures may have
been intermittent or controlled by medication, that does not
disqualify them from being considered a protected impairment.
*See* 42 U.S.C. § 12102(4)(D); 29 C.F.R. § 1630.2(j)(1)(vii). The
Court therefore finds that Lareau has met her *prima facie* burden
of showing a qualifying disability.

## 2. Otherwise Qualified

Lareau has also established, for purposes of summary
judgment, that she was otherwise qualified to perform the
essential functions of her job, with or without reasonable
accommodation. "*McDonnell Douglas* requires only a minimal
showing of qualification to establish a *prima facie* claim. [A

plaintiff] only needs to demonstrate that she possesses the basic skills necessary for performance of [the] job." *Sista*, 445 F.3d at 171 (quoting *Owens v. New York City Housing Authority*, 934 F.2d 405 (2d Cir. 1991)).

During her employment at NMC, Lareau was swiftly promoted to positions of increasing responsibility. She also received letters of recommendation from senior administrators, including NMC's CFO. Shortly prior to her termination, an August 16, 2016 email from Bovat described Lareau has having "met our minimum requirements for most items . . . that were in need of immediate improvement." ECF No. 132-16 at 10. When she was promoted to a management position, NMC contemplated formally supporting her development. Instead, after her seizures, she was put on a PIP that she claims was a result of disability discrimination. Viewing the undisputed facts in Lareau's favor, she has made the minimal showing necessary to establish that she was otherwise qualified to perform her job. At the very least, the genuine material facts with regard to her ability to perform her job are in dispute.

### 3.   **Reasonable Accommodation**s

Lareau also alleges that NMC failed to provide her with reasonable accommodations. In order for a plaintiff to put forth a *prima facie* showing of employment discrimination in the context of a failure to accommodate claim, she must demonstrate that with

reasonable accommodations she could perform the essential functions of the job, and her employer failed to make such accommodations. *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 (2d Cir. 2006) (quotation marks omitted).

"In the context of the ADA, reasonable accommodation may include, *inter alia*, modification of job duties and schedules, alteration of the facilities in which a job is performed, acquisition of devices to assist the performance of job duties, and, under certain circumstances, 'reassignment to a vacant position.'" *McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009) (quoting 42 U.S.C. § 12111(9)(B)). "[T]he ADA does not require creating a new position for a disabled employee." *Graves*, 457 F.3d at 187. In cases in which the disability was known or obvious, and the employer thus knew or reasonably should have known of the need for an accommodation, an employee need not issue an express request for accommodation. *See, e.g., Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008).

NMC submits that Lareau did not need reasonable accommodations to perform her job, and never requested any such accommodations. Lareau responds that NMC was on notice of her epilepsy from the moment of her hiring, and that her Fitness for Duty Report listed her vulnerabilities. Specifically, the Report noted that sleep deprivation and undue stress would make a

seizure more likely. The Fitness for Duty Report also highlighted that Lareau might be needing extra time to make up for missed work and to participate in career development activities. The Report further cited Lareau's right to reasonable accommodations and her right to be free from discrimination.

On July 29, 2016, Lareau met with Conley, spoke about her driving limitation, and expressed her belief that she was being targeted by Benware and Bovat. She also referenced the Fitness for Duty Report and stated that the listed accommodations were not being respected. When Conley suggested submitting an accommodations request to a committee, Lareau explained that she was fearful of retaliation. Lareau now contends that Conley failed to offer alternatives, such as a specially-comprised committee, that might have avoided the risk of retaliation.

While the Fitness for Duty Report only offered potential accommodations to be applied as necessary, it arguably put NMC on notice that issues such as additional stress and tight project deadlines could be problematic. Lareau's conversation with Conley clarified that the need for accommodations was not being respected. Viewing the facts in the light most favorable to non-movant, the Fitness for Duty Report and Lareau's discussion with Conley should have alerted NMC to assess the possibility of additional accommodations before terminating her employment.

Lareau also faults NMC for failing to engage in an interactive process to help her manage her work tasks and environment. NMC submits that no such process was necessary, since Lareau admits that she was able to perform the essential functions of her job without accommodations. NMC also contends that the conversation with Conley, including his suggestion that she identify reasonable accommodation, constituted an interactive process.

"The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." *See Jackan v. N.Y.S. Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000). "[A]n employer's failure to engage in a good faith interactive process [to identify a reasonable accommodation] can be introduced as evidence tending to show disability discrimination." *Sheng v. M&T Bank Corp.*, 848 F.3d 78, 87 (2d Cir. 2017). Here, NMC was on notice of Lareau's disability and that her disability impacted certain work tasks, including driving. NMC was also on notice of potential health issues resulting from fatigue or added stress. NMC, through Conley, communicated with Lareau about some of these issues. It is unclear whether, or to what extent, that process continued after Lareau expressed her fear that a request for accommodations would likely result in additional retaliation. Accordingly, there are

issues of material fact in dispute as to the extent and
effectiveness of NMC's engagement in the interactive process
envisioned by the ADA.

**B.    Non-Discriminatory Reason**

There is no dispute that NMC is subject to the ADA, or that
Lareau suffered an adverse employment action (termination).
Having found that Lareau suffered from a qualifying disability,
and that she has set forth a *prima facie* case of discrimination,
the Court must proceed to the next question in the *McDonnell
Douglas* test: whether NMC has articulated a legitimate,
nondiscriminatory reason for her firing.  This burden is "merely
'one of production, not persuasion.'"  *Wright v. Jewish Child
Care Ass'n of New York*, 68 F. Supp. 3d 520, 528 (S.D.N.Y. 2014)
(quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142
(2000)).

NMC submits that Lareau was terminated because of poor job
performance.  The record contains testimony to support NMC's
claim, including criticisms that allegedly gave rise to the PIP
and third-party criticism of Lareau's performance.  NMC has
therefore sufficiently articulated and supported its claim of
nondiscriminatory reasons for Lareau's firing.

**C. Pretext**

The burden thus shifts back to Lareau to present evidence
sufficient for a rational finder of fact to conclude that NMC's

proffered reason for her termination is a pretext, and that NMC
was in fact motivated by unlawful discrimination. *See Stern v.
Trs. of Columbia Univ. in City of N.Y.*, 131 F.3d 305, 312 (2d
Cir. 1997). Lareau contends that circumstantial evidence
supports her position. Specifically, she links her firing to her
medical problems and the resulting expense to NMC.

Lareau submits that following her 2015 job appraisal and
receipt of positive evaluations, NMC's Human Resources Department
was informed of the expense of her epilepsy treatment. Lareau
notes that while the stated reason for her firing was her failure
to satisfy the requirements of the PIP, Bovat's August 2016 email
indicated that any shortcomings identified in the PIP had been
remedied. She therefore alleges that her firing was based not
upon performance issues, but upon discriminatory financial
decisions.

Lareau's evidence of pretext also includes NMC's alleged
failure to follow its own procedures. As noted above, Lareau
contends that NMC failed to follow its usual protocol when
pursuing the PIP insofar as it failed to provide her with advance
written notice of performance issues. "[A]n employer's deviation
from its own standard procedures may serve as evidence of
pretext." *Hurlbert v. St. Mary's Health Care System, Inc.*, 439
F.3d 1286, 1299 (11th Cir. 2006); *see also Colgan v. Fisher
Scientific Co.*, 935 F.2d 1407, 1423 (3d Cir.) (employer's failure

24

to provide employee the customary reevaluation prior to termination "could permit the trier of the fact to infer that management willfully orchestrated the sequence of events"), *cert. denied*, 502 U.S. 941 (1991); *Heinemann v. Howe & Rusling*, 529 F. Supp. 2d 396, 409 (W.D.N.Y. 2008).

Finally, Lareau cites NMC's inability to document her performance issues.  For example, NMC has allegedly failed to document that "Score Card" was an essential element of Lareau's job.  This final argument does not carry significant weight, as the burden is on the plaintiff, not the defendant, to show pretext.  *See Evans v. Port Auth. of New York & New Jersey*, 192 F. Supp. 2d 247, 275 (S.D.N.Y. 2002) ("Defendants' failure to produce documentary evidence . . . gives the Court some pause, but it is plaintiff's burden to establish pretext, not the defendants' burden to disprove it.").

Nonetheless, viewing the facts in a light most favorable to Lareau, the Court finds that she has presented sufficient evidence of pretext to present the issue to a jury.  Perhaps most significant is the timing of the PIP after Lareau's seizures.  "A plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action."  *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) (quotation marks omitted); *see also Kaytor*

*v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010) ("Close temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection between a protected activity and retaliatory action.").  Lareau contends that the expense of her epilepsy treatment, coinciding with cost overruns at NMC, motivated Conley and possibly others to initiate the PIP process without prior written notice or warnings in an effort to ultimately terminate her employment.  While there are key material facts in dispute as to the actual reasons for Lareau's termination, the Court cannot find as a matter of law that NMC's actions were free from discriminatory motives.  NMC's motion for summary judgment on the question of disability discrimination under the ADA is therefore denied.

### III. *Prima Facie* Claim of Retaliation

Lareau also alleges that she was fired in retaliation for exercising her rights under the FMLA.  To establish a *prima facie* retaliation claim, she must show that (1) she engaged in activity protected by the ADA, (2) the defendant was aware of the activity, (3) the defendant took an adverse action against the plaintiff, and (4) there was a causal connection between the adverse action and the protected activity.  *Treglia v. Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002).  With respect to FMLA retaliation, NMC contests the fourth requirement: causal

connection.

A causal connection of retaliation can be shown either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory actions directed against the plaintiff by the defendant." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000). Here, Lareau claims that she submitted FMLA paperwork for leave through July 7, 2016. When she returned from leave, her work assignments were shifted and, despite her disability-related driving limitation, she was given additional off-site responsibilities. She discussed her situation with Conley, as well as her fear of seeking formal accommodations. After taking a pre-scheduled vacation, she was terminated on August 29, 2016. The termination occurred less than seven weeks after she returned from FMLA leave. Viewing these facts in a light most favorable to Lareau, the Court finds that she has sufficient evidence of FMLA-based retaliation to present her case to a jury.

## IV. Breach of Medical Confidentiality

Lareau next claims that Conley improperly received information from TRG about increased medical costs incurred by individual employees. Federal law requires that medical records

be kept confidential and that an employer's access to such records be limited.  *See* 42 U.S.C. § 12112(d).  While there are explicit statutory exceptions, *see id.* § 12112(d)(4)(A), the Second Circuit has held that inquiries about employee medical issues must be "job-related and consistent with business necessity."  *Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 97 (2d Cir. 2003).

Lareau alleges that Conley's request for individual employee medical cost information was an impermissible, disability-related inquiry.  NMC responds that it was gathering information in order to administer its self-insured benefits plan, and that such actions are covered by the safe harbor provisions of 42 U.S.C. § 12201(c) and 29 C.F.R. § 1630.16(f).  Federal law, however, states that the safe harbor provisions "shall not be used as a subterfuge to evade the purposes of" the ADA. 42 U.S.C. § 12201(c).

By requesting information on costs incurred by individual employees, Conley was arguably seeking out costly employees. Lareau was one such employee, and Conley and others at NMC subsequently undertook actions that resulted in her termination. Lareau has therefore offered sufficient facts to survive summary judgment on the question of whether Conley's request for information was a "subterfuge" for discrimination.

**V.   Hostile Work Environment and Punitive Damages Claims**

NMC has moved for summary judgment to the extent that Lareau is bringing a claim of hostile work environment, and on her claim of punitive damages.  Lareau's response to the motion for summary judgment does not address either issue.  Accordingly, the Court assumes that hostile work environment is not an independent claim, and is instead a part of Lareau's claims of retaliation and wrongful termination.

With respect to the claim for punitive damages, NMC argues in conclusory fashion that Lareau's factual allegations do not meet the requisite legal standard.  The Court disagrees, as the undisputed facts do not show that punitive damages are barred as a matter of law.  *See Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (holding that an unopposed summary judgment motion may not succeed where the undisputed facts fail to show that the moving party is entitled to judgment as a matter of law).  Summary judgment on the claim for punitive damages is therefore denied.

## Conclusion

For the reasons set forth above, NMC's motion for summary judgment (ECF No. 120) is **denied.**

DATED at Burlington, in the District of Vermont, this 8th day of July, 2019.

/s/ William K. Sessions III
William K. Sessions III
District Court Judge